IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| TERRANCE MOORE, | ) | |
| | ) | |
| Movant, | ) | CASE NO. 3:08-0756 |
| | ) | JUDGE HAYNES |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

**MEMORANDUM**

Movant, Terrance Moore, filed this action under 28 U.S.C. § 2255, seeking to set aside his convictions for conspiracy to possess with the intent to distribute five (5) kilograms or more of cocaine and simple possession of cocaine for which Movant received an effective sentence of 188 months. Movant's claim is that he was denied effective assistance of counsel at his trial. After a review of the motion, the Court ordered the United States to file a response that was filed (Docket Entry No. 6) to which Movant filed a reply (Docket Entry No. 9).

**A. Procedural History**

The Fourth Superseding Indictment charged Movant with one count of conspiracy to possess with intent to distribute five (5) kilograms or more of cocaine and a second count of possession of five (5) kilograms or more of cocaine with intent to distribute. (United States v. Moore, 3:02cr-00128, Docket Entry No. 318; Fourth Superseding Indictment). On January 31, 2005, a jury found Movant guilty of both Counts. Id.; Docket Entry Nos. 431, 432. On June 3, 2005, the Court sentenced Movant to 188 months on Count One and 60 months on Count Two, to run concurrently. Id.; Docket Entry No. 489, Judgment. Movant filed a notice of appeal. Id.;

Docket Entry No. 481, Notice of Appeal. On July 5, 2007, the Sixth Circuit affirmed Petitioner's conviction. <u>Moore v. United States</u>, 240 Fed. Appx. 699 (6th Cir. 2007).

## B. Findings of Fact

The facts underlying the Movant's convictions were summarized by the Sixth Circuit on Movant's direct appeal as follows:

> The evidence presented to the jury showed the following. Javier Zamora ran a marijuana and cocaine distribution network centered in Chicago. Zamora employed Phillip Pena–Santiago to transport the drugs from sources in downtown Chicago to Zamora's residence, which he used as a storage facility. And he employed Efren Lopez–Benitez to courier drugs from Zamora's residence to buyers in Michigan, including Jose Fernando Moran Ocegueda.
>
> In April 2002, Zamora gave Lopez–Benitez eight to ten pounds of marijuana and told him to contact Ocegueda because "he could move it." JA 1350–51. Lopez–Benitez contacted Ocegueda and sold him the marijuana. Lopez–Benitez arranged another sale of drugs—this time half a kilogram of cocaine—to Ocegueda from Zamora a while later.
>
> In the early summer of 2002, Ocegueda approached Lopez–Benitez about buying five to seven kilograms of cocaine, which he planned to cut and sell for $26,000 a kilogram. They met at Zamora's house, and Zamora agreed to provide Ocegueda with the cocaine but Ocegueda "would have to wait." JA 1359. While discussing the delivery of the cocaine with Lopez–Benitez and Guillermo Alvarez–Garcia (another colleague) at a restaurant in Kalamazoo, Michigan, Ocegueda offered the use of a 1998 Plymouth Breeze. The Plymouth Breeze was useful for transporting drugs, Ocegueda explained, because it had a hidden compartment where the passenger-side airbag used to be.
>
> In July, Zamora arranged to buy the cocaine from a supplier in Memphis, Tennessee. After Lopez–Benitez refused to retrieve Ocegueda's cocaine from Memphis, Zamora contacted Pena–Santiago, and he agreed to make the trip. On July 9, Lopez–Benitez picked up the Plymouth Breeze from Ocegueda, met with Pena–Santiago and taught him how to open the car's hidden compartment. Lopez–Benitez also gave Pena–Santiago a hand-drawn map showing him where to go in Memphis and the phone number of Paulino Guizar—Zamora's brother-in-law and Pena–Santiago's contact in Memphis. That night, after arriving in Memphis, Pena–Santiago called Guizar, arranged to meet him and rented a hotel room.
>
> The two met the next day and scheduled a meeting with "the person holding the cocaine"—Ferlandis Herod. JA 770. Herod, who drove a red pick-up truck (a "red

2

Ford Ranger truck," JA 1786), met the two at a gas station and directed them to follow him to a nearby cemetery. There, the three transferred the cocaine from the bed of Herod's pick-up to the trunk of the Plymouth Breeze, and Herod left.

All of this made Guizar upset because they now had "[t]oo many kilos of cocaine." JA 774. He made a series of phone calls, which prompted another meeting with Herod, this time outside Pena–Santiago's hotel. Herod offered to "take [back] as many [kilograms] as [they] were going to give him," JA 775, but left empty-handed because Guizar could not decide how much to return. Later that night, Guizar and Pena–Santiago met with Herod again at a gas station and followed him to his residence on Cleopatra Drive. They parked the Plymouth Breeze in Herod's garage, unloaded a portion of the cocaine and went into Herod's house for "a couple of minutes" to talk. JA 778–79. Escorted by Herod on a blue Yamaha motorcycle, Pena–Santiago and Guizar returned to the hotel for the night.

<u>The next day, July 11, Pena–Santiago and Guizar met two of Guizar's colleagues and purchased a vacuum-sealing, food-storage system from Sam's Club. After several phone calls, they met with Terrance Moore, who led them to a house on West Holmes Avenue. Eric Griffin, one of Moore's friends, owned the house and had agreed to let Moore use it to unload and store "some dope." JA 791, 1159.</u> That night, Pena–Santiago and Guizar retrieved the cocaine they had left at Herod's house and put it in Griffin's garage. <u>As payment for the use of Griffin's garage, Moore and Griffin received two to three kilograms of cocaine. At the same time, Moore gave a pistol to one of Guizar's colleagues, who handed it to Guizar, who handed it to Pena–Santiago, who in turn left the gun in the garage.</u>

When everyone but Guizar and Pena–Santiago had left the garage, these two inventoried the remaining cocaine and determined that there was between 70 and 80 kilograms. Guizar and Pena–Santiago repackaged the cocaine using the vacuum-sealing system from Sam's Club, placed 12 to 15 kilograms in the gas tank of Guizar's truck and 7 kilograms in the hidden compartment of the Plymouth Breeze. At that point, Guizar told Pena–Santiago to deliver the seven kilograms in the Plymouth Breeze to Nashville before restocking and returning to Chicago. Pena–Santiago also spoke with Zamora, who promised him "a truck plus a bunch of money" for completing the additional delivery. JA 811.

The next morning, July 12, Pena–Santiago left for Nashville in the Plymouth Breeze. About 50 miles outside of Nashville, an officer stopped Pena–Santiago for speeding and Pena–Santiago consented to a search of the car. During the search, Pena–Santiago called Zamora and told him that he had been pulled over for speeding but that the cocaine remained safely hidden. When the police discovered the cocaine hidden in the Breeze's compartment, they arrested Pena–Santiago, and soon after he agreed to cooperate.

3

At the urging of the police, Pena–Santiago placed several recorded telephone calls to Zamora, Lopez–Benitez and Guizar. Pena–Santiago told them he had been stopped for speeding and received a speeding ticket. He said the police had not found the hidden compartment (and the cocaine) but that they had impounded the Plymouth Breeze after finding marijuana in the trunk. Pena–Santiago also told Zamora that the police would release the vehicle only to its registered owner and that he needed money for a hotel room.

Zamora contacted Lopez–Benitez and told him to go to Nashville to pick up the Plymouth Breeze from the impound lot. Ocegueda also ordered Alvarez–Garcia and another person to go with Lopez–Benitez and called to check on their progress during the drive. Upon their arrival in Nashville, they went to Pena–Santiago's hotel to pick him up, but they were arrested instead.

Meanwhile, Moore called Griffin and told him to pick up Guizar, who was still staying at Griffin's house on West Holmes Avenue, and bring him to Moore's residence in Mississippi. Because Griffin "didn't know if police were coming or not," he did not have much time to check and see if all the drugs had been removed from his garage, but when Moore asked if Griffin and Guizar "[got] everything out of the house," Griffin said they had. JA 1174. That evening the police searched Griffin's property and found empty kilogram wrappers in the trash can, a hotel receipt for "Phillip Pena," JA 1305, an instructional video for using a vacuum-sealing system and an old bill addressed to "Terrance Moore," JA 1313.

Id. at 702-04 (emphasis added). The other factual findings are set in the context of Movant's specific claims.

## B. Conclusions of Law

For relief under 28 U.S.C. § 2255, a movant must establish an error of constitutional magnitude which "'had substantial and injurious effect or influence in determining the jury's verdict.'" Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). The record must establish a fundamental defect or a complete miscarriage of justice to warrant relief. Reed v. Farley, 512 U.S. 339, 348 (1994). A § 2255 motion cannot challenge the claims presented on direct appeal absent exceptional circumstances or an intervening change in the law. Davis v. United States, 417 U.S. 333, 342 (1974); DuPont v. United States, 76 F.3d 108, 110 (6th Cir. 1996) ("'A § 2255 motion may not be used to relitigate

4

an issue that was raised on appeal absent highly exceptional circumstances.'") (quoting United States v. Brown, 62 F.3d 1418 (6th Cir. 1995)). "Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either 'cause' and actual 'prejudice,' or that he is 'actually innocent.'" Bousley v. United States, 523 U.S. 614, 622 (1998) (citations omitted).

In this action, Movant's specific claims are that his trial counsel was ineffective for his failures: (1) to demonstrate to the jury that the evidence was insufficient to convict him of conspiracy and to hold Movant responsible for five to fifteen kilograms of cocaine; (2) to demonstrate that Petitioner was not responsible for at least five 5 kilograms of cocaine; and (3) to demonstrate that Movant lacked any ties to the telephone records that the Government used to prove the conspiracy.

To establish ineffective assistance of counsel, a movant must show: (1) that his counsel's performance fell below an objective standard of reasonableness and (2) that a "reasonable probability" exists that the performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 687-94 (1984). In reviewing counsel's performance, the Court must "indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance." Id. at 689. Prejudice is a "reasonable probability that, but for counsel's unprofessional errors, the result of proceeding would have been different." Id. at 694. "A determination of the prejudice prong of the Strickland analysis is necessarily dependent on a review of the merits of [Movant's] . . . claim." Cross v. United States, 893 F.2d 1287, 1290 (11th Cir. 1990).

Whether an attorney's performance was reasonably effective requires consideration of the totality of the circumstances of the trial. Strickland, 466 U.S. at 688. "Judicial scrutiny of

counsel's performance must be highly deferential," id. at 689, and a strong presumption "arises" that "counsel's conduct falls within the wide range of reasonable professional assistance," id., particularly on tactical or strategic decisions. Id. at 690. Trial counsel's failures must be "'outside the wide range of professionally competent assistance.'" Smith v. United Sates, 348 F.3d 545, 551 (6th Cir. 2003) (quoting Strickland, 466 U.S. at 690).

Movant's burden is to "show a reasonable probability that, but for his attorney's errors, the proceedings would have produced a different result." Ross v. United States, 339 F.3d 483, 492 (6th Cir. 2003). In this showing, "[i]t will generally be appropriate for a reviewing court to assess counsel's overall performance throughout the case in order to determine whether the 'identified acts or omissions' overcome the presumption that a counsel rendered reasonable professional assistance." Kimmelman v. Morrison, 477 U.S. 365, 386 (1986) (quoting Strickland, 466 U.S. at 690).

As to trial counsel's failure to cite the lack of sufficient proof of a single conspiracy involving at least five (5) kilograms of cocaine from Memphis to Michigan, Phillip Pena-Santiago, a government witness, described Movant's role in this conspiracy as well as the roles of the other co-defendants. (Docket Entry No. 546, Trial Transcript at 75-264). Movant's trial counsel sought to discredit Pena-Santiago's testimony, (Docket Entry No. 547, Trial Transcript at 225-251 and Docket Entry No. 548, Trial Transcript at 3-33), by painting Pena-Santiago as a liar who could not be trusted. (Docket Entry No. 547, Trial Transcript at 230-235). Movant's counsel raised this issue in Movant's direct appeal.

On direct appeal, the Sixth Circuit affirmed the jury's finding that Pena-Santiago was a credible witness and Movant was a middleman in the conspiracy. The Sixth Circuit held that a

6

rational juror could find Movant and his co-conspirators guilty beyond a reasonable doubt. Id. at 704-705. As the Sixth Circuit stated:

> Defense counsel attempted to impeach Pena–Santiago's testimony by repeatedly stressing to the jury that Pena–Santiago expected to benefit from his cooperation, see JA 973, 1056, that the DEA paid Pena–Santiago's expenses in return for his assistance, see JA 964, 1019–20, 1050, that Pena–Santiago had a "lot of drug history" as both a courier and a user, JA 950, and that Pena–Santiago had received substantial mental health counseling, see JA 1007. Defense counsel also wove the disclosed information into their cross-examination, asking Pena–Santiago about his work with law enforcement in conducting controlled buys, about his blackouts, and about his admissions to his mental health counselor. Given that defense counsel cross-examined Pena–Santiago on these very issues and given that Moore has not shown how he would have cross-examined Pena–Santiago differently had he received the materials earlier, he has not shown prejudice.
>
> * * *
>
> Moore was an essential link in the conspiracy; he introduced Guizar and Pena–Santiago to Griffin; he obtained Griffin's permission to use the West Holmes Avenue house to unload and store the cocaine; Moore and Griffin received two to three kilograms of cocaine for these services; and when Moore learned that Pena–Santiago had been arrested, he directed Griffin to pick up Guizar from the West Holmes Avenue house and bring him to Mississippi.

Id. at 707, 712. Thus, Movant's claim for ineffective assistance of counsel that counsel failed to demonstrate that the evidence was insufficient lacks merit.

> As to Movant's ties to the telephone records on his direct appeal, the Sixth Circuit found:
>
> Guizar, Herod, Moore and Ocegueda all claim that the government unduly prejudiced their defenses by offering improper testimony analyzing the telephone records in the case and that the district court's limiting instructions did not cure the problem. The government introduced 19 different phone records, including bills and printouts of raw calling data, to corroborate the testimony of Pena–Santiago, Alvarez–Garcia, Griffin and Lopez–Benitez that the defendants communicated frequently throughout the conspiracy via telephone.
>
> * * *
>
> [T]he district court limited the telephone records to corroborating the particular phone calls attested to by government witnesses, and <u>the government showed that</u>

> the conspirators had access to the phones and that the records corroborated each witness's testimony.

Id. at *708, 709.

The trial transcript reflects Movant's counsel cross-examined witness and co-conspirator Eric Griffin extensively about the telephone number and cited DEA agent's analysis of the telephone records, but the Court struck this testimony as unreliable and instructed the jury to strike any of their notes of her testimony. Id. This issue was decided in Movant's direct appeal and that Court affirmed the Court's decision. "A Federal prisoner may not relitigate in a § 2255 motion to vacate sentence claims that were raised and considered on direct appeal." Dupont, 76 F.3d at 111 (quoting Kelly v. United States, 977 F.2d 581 (6th Cir. 1992)).

As to Movant's trial counsel's failure to demonstrate that Movant was not responsible for at least 5 kilograms of cocaine and Movant's counsel's failure to argue effectively against a two-level enhancement for possessing a weapon during the commission of the offense, the sentencing transcript reveals considerable discussion concerning Movant's knowledge and foreseeability of the amount of cocaine involved in the conspiracy. (Docket Entry No. 527, Sentencing Transcript). Government counsel contended the evidence established reasonable foreseeability and Movant's responsibility for the 50 to 150 kilograms of cocaine because Movant had been paid two to three kilograms of cocaine and was present when a substantial amount of the cocaine was unloaded. Id. at 8-9. Movant's counsel challenged that proof was not presented to the jury and cited the lack of testimony about the amount of cocaine that was placed in the car when Movant first arrived at the house in Memphis where the cocaine was to be stored. Id. at 13-14. Movant's counsel cited co-conspirator testimony that they were not to talk to Movant about the amount of cocaine involved. Id. The Court found Movant responsible for at least five (5)

8

kilograms, but less than 50 kilograms that was less than the 78 kilograms Government's counsel sought. Id. at 16. This claim lacks merit.

As to Movant's counsel's failure to object to the two-level enhancement for possessing a firearm in connection with a drug offense, the sentencing transcript reveals Movant's counsel's objection to this enhancement, contending that the firearm was left in Movant's possession at the residence with the cocaine, but the weapon was not used to further the conspiracy. Id. at 16-17. The Sixth Circuit found as follows on Movant's direct appeal:

> Moore was an essential link in the conspiracy; he introduced Guizar and Pena–Santiago to Griffin; he obtained Griffin's permission to use the West Holmes Avenue house to unload and store the cocaine; Moore and Griffin received two to three kilograms of cocaine for these services; and when Moore learned that Pena–Santiago had been arrested, he directed Griffin to pick up Guizar from the West Holmes Avenue house and bring him to Mississippi. Moore, indeed, was a substantial contributor to the conspiracy, and given the "nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1), 188 months' imprisonment was reasonably necessary to "provide just punishment" and to "afford adequate deterrence to criminal conduct," id. § 3553(a)(2)(A)–(B).

Id. at 712.

For these reasons, Movant's motion to vacate his sentence under 28 U.S.C. § 2255 (Docket Entry No. 1) should be denied.

An appropriate Order is filed herewith.

**Entered** on this the ____ day of August, 2011.

                                            WILLIAM J. HAYNES, JR.
                                            United States District Judge